OPINION
BYBEE, Circuit Judge:
The Los Angeles Police Department suspected that defendant Kevin Jones was involved in a gang shooting that left one person dead and two injured. Detectives picked Jones up and began interrogating him. After hours of questioning, and little progress, Jones finally told the officers “I don’t want to talk no more.” Undeterred, the officers continued questioning Jones, and eventually, he made a number of incriminating statements. Jones’s statements were the lynchpin of the state’s prosecution against him — and Jones was convicted and sentenced to seventy-five years to life.
On direct appeal, Jones contended that officers were wrong to continue to interrogate him after he invoked his right to remain silent, and that his incriminating statements should not have been used against him. The California Court of Appeal held that Jones did not unambiguously invoke his right to remain silent, so no suppression was warranted. It reasoned that after officers continued to interrogate Jones with only a single follow-up question, he continued to talk and made statements that cast some doubt on whether he had actually invoked his right to remain silent.
But the Supreme Court has been clear on this point: When a suspect invokes his right to silence, the officers’ interrogation must cease. Period. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). By continuing to interrogate Jones after his invocation, the officers squarely violated Miranda. That means the government cannot use against Jones anything he said after his invocation. And that includes using Jones’s subsequent statements to “cast retrospective doubt on the clarity of [his] initial request itself.” Smith v. Illinois, 469 U.S. 91, 98-99, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (per curiam); see Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); Miranda, 384 U.S. at 444, 86 S.Ct. 1602. Allowing the state to use Jones’s post-invocation statements against him, even to argue that his initial invocation was ambiguous, is thus contrary to clearly established Supreme Court case law. Once Jones said he wished to' remain silent, even one question was one question too many.
We hold that any reasonable jurist would have to conclude that when Jones said he did not want to talk “no more,” he meant it. The Court of Appeal’s decision is both contrary to and an unreasonable application of clearly established Supreme Court law, and it is based on an unreasonable determination of the facts. Further, given the pivotal role Jones’s statements played at trial, the trial court’s error was not harmless. We reverse the judgment of the district court and remand with instructions to grant the writ.
I
A. The Shooting
In August of 2003, three teenagers— members of the Eight Treys Gangster *1133 Crips — were stopped at a gas station that bordered the territory of neighboring rival gang Westside Rolling 90s Crips. A black Ford pulled up to the teens. An African-American male wearing a Cleveland Indians cap leaned out the passenger window and shouted, “F— [Eight Treys]. This is Westside Rolling Crips.” The Ford then drove off.
The three teenagers finished pumping their gas and pulled out of the gas station into the intersection. Moments later, the black car reappeared on their right side. The driver of the black car, a “[l]ight skinned” African-American, made' a Rolling 90s gang sign, and then turned and said something to his passenger. The passenger lifted himself onto the window frame of his door. He leveled a semi-automatic weapon at the teens and opened fire. Two of the teens were struck, along with a third person who was driving nearby. One of the teens died from his wounds later that night.
On August 15, 2003, police officers stopped Jones, who was driving his black two-door Ford Escort. The officers had previously received a' tip from an informant that Jones was a member of the Rolling 90s who drove a car like the one identified in the shootings. The police found a Cleveland Indians cap in Jones’s car and, after impounding the car, matched fingerprints on the outside door to a person who belonged to a gang affiliated with the Rolling 90s. Police brought Jones in for questioning that night.
B. The Interrogation
Jones was brought to the police station some time between 9:00 and 9:40 p.m. He was read his Miranda rights and interviewed later that night, beginning at 12:33 a.m., by Detectives Kevin Jolivette and Bill Fallon. Jones was nineteen years old, had graduated from technical school, and worked full-time for UPS. The interview lasted between two and three hours.
At the outset of the interview, Jones told the detectives that he owned his black Ford Escort and that no one else drove it. He initially insisted that he had no knowledge of the shooting and that on the day in question he had driven straight home after finishing work.
The detectives lied to Jones, telling him they had incriminating evidence which did not actually exist. The detectives told Jones that witnesses had identified his car as the one used in the shooting and that the car appeared on surveillance video from the gas station. The detectives held consistently to the ruse, insisting to Jones that they already knew he and his car were involved with the shooting and implored him to come clean about his role. The police told Jones that he - would receive more lenient punishment if he admitted to being only the driver rather than the shooter or the person whose idea the shooting was.
Over the course of the interview, Jones’s story changed several times. First, he told the police that he had no personal knowledge of the shooting and gave a somewhat inconsistent story about how he learned of the shooting from a barber on the street while driving home a few days after the shooting. Jones stated that, on the day of the shooting, he came straight home from work, parked his car at his house around 5:00 p.m. or 5:30 p.m., and then walked to the gym. He stated that around 6:45 p.m. he noticed his car was missing, but assumed it would be returned, and went to the gym anyway. His explanations for why he assumed the car would be returned changed somewhat, but he said that by the time he got home from the gym, the car was back. As detectives continued to press Jones about his implausible story, the following exchange occurred:
*1134 Jolivette: Kevin, do you think — why don’t you stop this man.
Jones: All right.
Jolivette: Stop this. The thing is you drove a car, it shows that on the tape and that’s all I’m going to put down, as far as what you were doing. You drove the car. You just didn’t know it was going to happen like that. Kevin, sit up, man.
Jones: I don’t want to talk no more, man.
Jolivette: I understand that, but the bottom line is—
Jones: You don’t want to hear what I’m telling you.
Jolivette: I’m so sorry. I can’t — you’re mumbling, you got to speak up. I got bad hearing.
Jones: I’m telling you all.
From there, questioning continued as normal, and eventually Jones made incriminating statements. Most importantly, he admitted to driving the car during the shooting. He claimed that a stranger with a gun jumped into his car, ordered him to drive to the gas station, yelled at the teenagers, and then hopped out of his car at the intersection and began shooting.
Officers arrested Jones a few days later and interviewed him again. The detectives pressed' him on the implausibility of his earlier statements about driving a stranger to the shooting, but Jones again stated that was what happened.
C. The Trial
The case against Jones revolved around the statements he made during the police interrogations. In her closing argument, the prosecutor explained there were no witnesses: “From the beginning, I had told you that there have been no identifications of Mr. Jones. None of the surviving victims were able to pick him out of the photographic lineup. None of them came into court and ID’d Mr. Jones.” No physical evidence connected Jones to the shooting. Indeed, witness testimony cut in favor of Jones’s case: Witnesses stated that the car involved in the shooting was different than Jones’s car, and Jones’s baseball cap was different from the one witnesses described.
Instead, the government relied on Jones’s statements. During her opening statement, the - prosecutor told the jury that “you’re going to hear Jones’ own words which convict him ... of being the driver in this case.” The prosecutor concluded: “Through all of these lies, you will have his admission that he drove in the shooting.” During closing arguments the prosecutor again relied heavily on Jones’s statements:
So what do you have? You have Mr. Jones by his own words identifying himself as the driver in this shooting ... [H]e tells you he was the driver in the shooting. And that’s it. That’s all you need. That’s evidence beyond a reasonable doubt that he is the driver in the shooting ... Once you review those tapes, if you believe those tapes, that’s the end of the inquiry for Mr. Jones.... So when you look through Jones[’s] taped statements, his words convicting himself as the driver in the shooting is all that you need. That is proof beyond a reasonable doubt.
The jury convicted Jones of first degree murder, two counts of attempted murder, two counts of shooting at an occupied motor vehicle, and assault with a firearm. The trial court sentenced Jones to five years,' plus 75 years to life.
D. Post-Trial Review
Jones appealed to the California Court of Appeal. The court affirmed his conviction in an unpublished decision. It ruled on Jones’s Miranda argument- in a single paragraph, reasoning that Jones’s statement that he did not “want to talk no *1135 more” was ambiguous in light of the statements he made after:
At a single point, midway through the first interview, appellant said, “I don’t want to talk no more, man.” His next sentence, however, was, “You don’t want to hear what I’m telling you.” Taken in context, considering [Jones’s] willingness to talk with the detectives before and after that point in the interview, [Jones] was expressing frustration with the detectives’ refusal to believe him, rather than unambiguously invoking his right to remain silent.
The court thus relied on the fact that Jones’s next sentence after saying he did not want to talk — made in response to officers continuing to question him — made his initial invocation ambiguous. Jones filed a petition for review with the California Supreme Court, which was denied without comment.
Jones then filed a federal habeas petition. The magistrate judge filed a Final Report and Recommendation — a report summarily adopted by the district judge— recommending denial of Jones’s petition. Because the district judge adopted the magistrate judge’s report, we look to this report as the decision. But curiously, in granting the certificate of appealability, the district judge’s analysis suggested that the State violated Miranda here. The district judge observed that Jones’s statement was a “seemingly unambiguous” invocation of his right to remain silent. “Petitioner said, T don’t want to talk no more, man.’ Aside from mentioning Miranda by name, what could be clearer?”
Like the California Court of Appeal, the magistrate judge’s report held Jones’s request was ambiguous in light of the statements he made after invoking his right to silence. The court also relied on the fact that Jones did not ask to remain silent again after his initial invocation.
II
We review the district court’s denial of a habeas petition de novo. Hebner v. McGrath, 543 F.3d 1133, 1136 (9th Cir. 2008). The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Jones’s petition. See Woodford v. Garceau, 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). We may grant the petition only if the state court’s adjudication of Jones’s claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(1)—(2).
A decision is “contrary to” Supreme Court precedent where “the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.” Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). We may not grant habeas relief unless the state court’s determination “was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). “[A]n unreasonable application of federal law is different from an incorrect application of federal law.” Williams, 529 U.S. at 410, 120 S.Ct. 1495 (emphasis removed). “A state court’s determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court’s decision.” Richter, 562 U.S. at 101, 131 S.Ct. 770 *1136 (internal quotation marks omitted). The standard is meant to be “difficult to meet.” Id. at 102, 131 S.Ct. 770.
Similarly, the standard for finding that a state court made an unreasonable determination of the facts is “daunting,” and “will be satisfied in relatively few cases;” Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004). But we can “conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.” Maxwell v. Roe, 628 F.3d 486, 503 (9th Cir. 2010). And where the state court makes factual findings “under a misapprehension as to the correct legal standard,” “the resulting factual determination will be unreasonable and no presumption of correctness can attach to it.” Taylor, 366 F.3d at 1001; see also Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).
In this case, the California Supreme Court summarily denied review. Looking through to the last reasoned state court decision, the California Court of Appeal’s decision will serve as the focus of our analysis. See Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir. 2013), amended on denial of reh’g, 733 F.3d 794 (9th Cir. 2013).
Ill
The California Court of Appeal determined that Jones’s statement that he “don’t want to talk no more” was made ambiguous by statements he made later in the interrogation. As we demonstrate in Part A, this determination was contrary to and an unreasonable application of clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). By continuing to interrogate Jones after he had invoked his right to remain silent, officers violated Miranda—which means the government cannot use against Jones anything he said after his invocation. This includes using Jones’s subsequent statements to police to “cast retrospective doubt on the clarity of the initial request itself.” Smith, 469 U.S. at 100, 105 S.Ct. 490. “To permit the continuation of custodial interrogation” after Jones’s invocation “would clearly frustrate the purposes of Miranda.” Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). To the extent the California Court of Appeal read ambiguity into Jones’s invocation — based on statements he made later — that finding was “an unreasonable determination of the facts.” 28 U.S.C. § 2254(d)(2). Because we also conclude in Part B that the admission of this evidence at trial was prejudicial, we reverse the district court’s decision denying the writ.[1]
A. Violation of clearly established law
1. Officers violated Miranda by continuing to interrogate Jones after he invoked his right to remain silent
The Supreme Court has made clear that once a person being questioned “indicates in any manner that he does not wish to be interrogated, the police may not question him.” Miranda, 384 U.S. at 445, 86 S.Ct. 1602. “The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries.” Id. To make sure that we understood this procedure, the Court repeated it: “If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Id. at 473-74, 86 S.Ct. 1602. “[A]ny statement taken after the person invokes his privilege cannot be oth *1137 er than the product of compulsion, subtle or otherwise.” Id. at 474, 86 S.Ct. 1602. Once a person has “exercise[d] ... his option to terminate questioning[,] he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation.... [T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was scrupulously honored.” Mosley, 423 U.S. at 103-04, 96 S.Ct. 321 (internal quotation marks omitted).
The Supreme Court has left us with no doubt that this prohibition on continued questioning is a “bright-line” rule, “a prophylactic safeguard whose application does not turn on whether coercion in fact was employed.” Id. at 98, 99, 96 S.Ct. 321 n.8. “[C]onjecture and hair-splitting” is what “the Supreme Court wanted to avoid when it fashioned the bright-line rule in Miranda.” Anderson, 516 F.3d at 790; cf. Davis, 512 U.S. at 461, 114 S.Ct. 2350 (noting that the benefit of a bright-line rule is the “clarity and ease of application” that “can be applied by officers in the real world ... without unduly hampering the gathering of information” by forcing them “to make difficult judgment calls” with a “threat of suppression if they guess wrong”).
Here, there is no doubt officers violated Miranda. Certainly, Jones saying he “did not want to talk no more” qualifies as “indicating] in any manner that he does not wish to be interrogated.” Miranda, 384 U.S. at 445, 86 S.Ct. 1602 (emphasis added). And there is no real dispute that officers continued interrogating Jones. Officers knew well that he was invoking his right, but continued to push him for more answers: “I understand that but&emdash;.” No fairminded jurist could reasonably interpret this statement to be “ceasing” the interrogation. Id.
2. Jones’s invocation was not ambiguous under Berghuis v. Thompkins
The Supreme Court recently added another layer to the Miranda inquiry: Whether the suspect invoked his right to remain silent unambiguously. Berghuis v. Thompkins, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). Up until Thompkins, the right to remain silent could be invoked in “any manner.” Miranda, 384 U.S. at 445, 86 S.Ct. 1602. On the other hand, the right to counsel could be invoked only “unambiguously.” Thompkins, 560 U.S. at 381, 130 S.Ct. 2250. In Thompkins, the Court clarified that the requirement that the right to counsel be invoked “unambiguously” would now be applied with respect to requests to remain silent. Id. Because we must now apply the rules from right to counsel cases to right to silence cases like Jones’s, we first walk through the right to counsel caselaw.
In Miranda, the Court held that the right to remain silent could be invoked “in any manner” and that the interrogation must then “cease.” Miranda, 384 U.S. at 445, 86 S.Ct. 1602. By contrast, with respect to the right to counsel, Miranda announced a slightly different rule: “If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.” 384 U.S. at 474, 86 S.Ct. 1602 (emphasis added). The scope of the two rights was thus not coextensive&emdash; the Court in Miranda was unequivocal on what officers must do when an accused invoked his right to silence; it was not as clear what they had to do when the right to counsel was invoked.
From there the caselaw diverged into two lines: One addressing invocations of the right to silence, the other addressing invocations of the right to counsel. In Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), with respect to the right to silence, the Court clarified that *1138 Miranda did not mean that “once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present,” id. at 104, 96 S.Ct. 321 n. 10, but repeated what Miranda had said: the suspect’s “right to cut off questioning” must be “fully respected,” id. at 104, 96 S.Ct. 321.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court continued to develop the requirements for invocations of the right to counsel. It held that “when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.” Id. at 484, 101 S.Ct. 1880 (footnote omitted). This was a change — a strengthening of the accused’s rights — in the right to counsel: “Edwards established a new test for when ... waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication.” Solem v. Stumes, 465 U.S. 638, 646, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). See id. at 648, 104 S.Ct. 1338. This was different than the test for the right to silence, which allowed police to continue questioning after some delay. Mosley, 423 U.S. at 118, 96 S.Ct. 321.
Right to counsel cases then addressed the requirement at issue in this case: How we determine that “the suspect [has] unambiguously requested] counsel.” Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). This development in the right to counsel context makes sense. Suspects can invoke their right to remain silent in many ways. They may invoke their right by simply remaining silent, or they may indicate in other ways — including by words — that they do not want to talk with police. By contrast, invoking the right to counsel cannot be accomplished by silence or pantomime, but requires the suspect to articulate specifically that she wants counsel. This line of cases explained that an “ambiguous or equivocal” request for counsel does not require police questioning to end and places no limits on how the interrogation can be used later. Id.
But the Court also held that the standard for invoking the right to counsel unambiguously was not a demanding one. A suspect need only invoke his rights “sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [such] a request.” Id. at 459, 114 S.Ct. 2350. He need not specifically reference his constitutional rights, nor need he use any specific terminology. Id. ■
The Court clarified that in determining whether an invocation of the right to counsel is ambiguous, “[u]nder Miranda and Edwards, ... an accused’s post request responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel.” Smith, 469 U.S. at 92, 105 S.Ct. 490. Allowing the government to use these pos-trequest statements to “cast retrospective doubt” on prior unambiguous invocations would give officers an incentive to ignore invocations in the hopes that a suspect may be persuaded to talk anyway. Id. at 100, 105 S.Ct. 490. “No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement....” Id. at 99, 105 S.Ct. 490. Construing a person’s unambiguous invocation of his Fifth Amendment rights by “looking to [his] subsequent responses to continued police questioning” and whether “considered in total, [his] statements were equivocal” is “unprece *1139 dented and untenable.” Id. at 97, 105 S.Ct. 490 (emphasis removed). Accordingly, “under the clear logical force of settled precedent, an accused’s postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.” Id. at 100, 105 S.Ct. 490.[2]
Finally, in Thompkins, the Court noted it had “not yet stated” whether the rules about ambiguity it had developed in the context of invocations of the right to counsel should also apply in the context of invocations of the right to silence. Thompkins, 560 U.S. at 381, 130 S.Ct. 2250. The Court held “there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel as issue in Davis.” Id. Thus, the Court held that the same “standards” about ambiguity it had developed in Davis and its progeny should now apply to invocations of the right to silence. Id.
The government and the dissent urge us to require that Jones’s statements be “unambiguous” in light of Thompkins, despite that this case came out long after the California Supreme Court’s decision. Dissenting Op. at 1142, 1145. Thompkins’s holding is nominally a new holding, see id. at 1134-35, but in this context it is a holding in the government’s favor because it clarified that invocations of the right to remain silent must also be unambiguous. Under the circumstances, we will apply Thompkins’s directive that the same standards for finding ambiguity in the right to counsel context should also apply to finding ambiguity in the right to silence context.
But Thompkins does not change much: No fairminded jurist could determine that Jones’s invocation was ambiguous. First, Jones’s initial request to remain silent was unambiguous on its face, and nothing about the prior context of the statement *1140 made it ambiguous or equivocal. Jones stated: “I don’t want to talk no more”; in other words, he did not want to talk anymore. See Garcia v. Long, 808 F.3d 771, 773-74 (9th Cir. 2015) (holding that a suspect answering “no” to the question “[d]o you wish to talk to me?” was an unambiguous request to remain silent under Miranda). Jones, did not equivocate by using words such as “maybe” or “might” or “I think.” See Anderson, 516 F.3d at 788; cf. Smith, 469 U.S. at 96-97, 105 S.Ct. 490 (holding that nothing in the statement “Uh, yeah. I’d like to do that” suggested equivocation). Nor did anything Jones did or said leading up to this statement make it ambiguous. During the interrogation leading up to this point, Jones spoke little. Most of the interrogation consisted of detectives repeatedly asking Jones questions and Jones giving short, often one-word answers. In any event, the fact that Jones spoke to officers for a while before invoking his right to remain silent makes no difference. The California Court of Appeal’s decision is simply “contrary to” and “an unreasonable application” of Miranda. 28 U.S.C. § 2254(d)(1); Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 (holding that the right to remain silent can be invoked “any time prior to or during questioning”).
The only statements that could cast any ambiguity on Jones’s initial invocation were statements he made after the fact. Indeed, the California Court of Appeal relied largely on Jones’s statement made after officers continued interrogating him, reasoning that because Jones made a follow-up statement after only a single clarifying comment from officers, his initial invocation was ambiguous. But it was clearly established, when determining whether the invocation of a constitutional right is ambiguous, that the California courts could not look to post-invocation statements to “cast retrospective doubt on the clarity of [Jones’s] initial request itself.” Smith, 469 U.S. at 98-99, 105 S.Ct. 490.[3] Officers continued to interrogate Jones after he had unambiguously asked to remain silent. When Jones said “I don’t want to talk no more,” the officer responded: “I understand that but — .” That means the government cannot rely on Jones’s la *1141 ter statements to establish that his earlier statement was ambiguous.
And the California court’s allusion to the fact that officers only interrogated Jones briefly after his invocation is of no matter. Even one question was one question too many. When an “individual indicates in any manner, at any time prior'to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 (emphasis added).
Nor does it matter, as the California court and federal district court seemed to suggest, that Jones did not repeat his request to remain silent later in the interrogation: “Under Miranda, the onus [is] not on [the suspect] to be persistent in [his] demand to remain silent. Rather, the responsibility flails] to the law enforcement officers to scrupulously respect [his] demand.” United States v. Lafferty, 503 F.3d 293, 304 (3d Cir. 2007). Relying on the fact that “[i]t was the defendant, not the interrogators, who continued the discussion,” “ignores the bedrock principle that the interrogators should have stopped all questioning. A statement taken after the suspect invoked his right to remain silent ‘cannot be other than the product of compulsion, subtle or otherwise.’ ” Anderson, 516 F.3d at 789-90 (quoting Miranda, 384 U.S. at 474, 86 S.Ct. 1602).
Although we give considerable deference to the state courts, “AEDPA deference is not a rubber stamp.” Id. at 786 (citing Miller-El v. Dretke, 545 U.S. 231, 240, 265, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)). The California Court of Appeal’s determination that Jones’s statement “I don’t want to talk no more” was ambiguous based on his responses to further questioning was either “an unreasonable determination of the facts,” 28 U.S.C. § 2254(d)(2), or an “unreasonable application” of Miranda, id. § 2254(d)(1). By continuing to ask questions, the officers failed to “scrupulously honor” Jones’s simple request. We accordingly hold that 28 U.S.C. § 2254(d) does not bar habeas review of Jones’s Miranda claim, and we conclude, on de novo review, that Jones’s constitutional rights were violated when his interrogation was used at trial.
B. Harmlessness
Miranda error does not entitle Jones to habeas relief if the error was harmless. In AEDPA proceedings, we apply the actual-prejudice standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under Brecht, habeas relief is only available if the constitutional error had a “substantial and injurious effect or influence” on the jury verdict or trial court decision. Id. at 623, 113 S.Ct. 1710 (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This standard is satisfied if the record raises “grave doubts” about whether the error influenced the jury’s decision. Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 2203, 192 L.Ed.2d 323 (2015) (brackets omitted) (quoting O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).
Under AEDPA, we accord deference to a state court’s harmlessness determination. Nevertheless, because the Brecht standard that we apply on collateral review is “less onerous” for the state than the “harmless beyond a reasonable doubt” standard that state courts apply on direct review, Brecht, 507 U.S. at 622-23, 113 S.Ct. 1710, the Supreme Court has explained that “it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former,” Fry v. Pliler, 551 U.S. 112, 120, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). We therefore apply the Brecht test, but we do so with *1142 due consideration of the state court’s reasons for concluding that the error was harmless beyond a reasonable doubt. Davis, 135 S.Ct. at 2198.
In Brecht, the Supreme Court determined that the state’s improper use of the petitioner’s post-Miranda silence for impeachment purposes was harmless. 507 U.S. at 688-39, 113 S.Ct. 1710. The state’s physical evidence against the defendant was “weighty,” and the state’s references to the post-Miranda evidence were “infrequent.” Id. at 639, 113 S.Ct. 1710.
The same cannot be said here. Jones’s own incriminating statements — made after he had invoked his right to silence-formed the backbone of the government’s case. Indeed, there was little other evidence before the jury. No witnesses identified Jones in relation to the shooting. Witnesses reported that a four-door vehicle with no body damage had been driven in the drive-by; Jones drove a two-door vehicle with extensive body damage. The only evidence linking Jones to the shooting consisted of an informant who told detectives that Jones was involved with a rival gang and that Jones drove a vehicle the same color (black) as the one used in the shooting. It is true that, prior to invoking his right to silence, Jones made some confusing comments about his whereabouts during the shooting, but that was weak tea compared with Jones’s other words admitting to the crime. Jones likely could not have been convicted without his confession.
Importantly, the prosecutor repeatedly referred to Jones’s incriminating statements, telling the jury that they could convict beyond a reasonable doubt based only on his own statements. The prejudice from a defendant’s confession “cannot be soft pedaled.” Anderson, 516 F.3d at 792. “A confession is like no other evidence”; it may be “the most ... damaging evidence that can be admitted” against a defendant. Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (internal quotation marks omitted).
Exercising “extreme caution,” as we must, “before determining that the admission of [a] confession at trial was harmless,” id. at 296, 111 S.Ct. 1246, we conclude that the admission of Jones’s interrogation had a substantial and injurious effect on the jury’s decision. Brecht, 507 U.S. at 637-38, 113 S.Ct. 1710. In light of our decision, we do not reach Jones’s remaining claims.
IV. CONCLUSION
The Supreme Court has repeatedly made clear that when a suspect simply and unambiguously says he wants to remain silent, police questioning must end. Under any reasonable interpretation of the facts, Jones simply and unambiguously invoked that right. Clearly established Supreme Court law required the suppression of Jones’s interrogation. The State shall either release Jones or grant him a new trial.
REVERSED and REMANDED.

. Because we reverse on Miranda grounds, we need not reach Jones’s alternative argument that his statements to police were invol-untaiy. See Dickerson v. United States, 530 U.S. 428, 433-34, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

. The dissent argues that we have unfairly attributed "sweeping propositions" to Smith. But we and the dissent seem to agree on Smith’s propositions. The dissent characterizes Smith’s holding as: "[Ojnce a suspect clearly invokes his right to counsel, officers may not continue to question him.” Dissenting Op. at 1147. Indeed, this is the same holding we rely on from Miranda: Once an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602. Both cases stand for the simple proposition that officers must stop questioning a suspect once he unambiguously invokes his right to silence — and if they do not — the suspect’s statements can no longer be used against him.
But the dissent appears to suggest something quite different. The dissent argues for a standard that would permit officers to ask some threshold number of questions before we find that officers have indeed not "ceased” “interrogating.” The dissent makes much out of the fact that "Detective Jolivette did not even get out a complete sentence.” Dissenting Op. at 1147. The dissent says that this is nothing like Smith where the officers interrogated the suspect "at length” after his invocation. But the dissent is suggesting we create a gray area about how much interrogation is interrogation enough. And that is exactly what the Supreme Court told us not to do when it made Miranda a "brightline” rule. Smith, 469 U.S. at 99 n. 8, 105 S.Ct. 490. There can be no serious dispute that officers did not “cease” their interrogation of Jones once he had unambiguously told them he wanted to remain silent. And there the Miranda analysis must end.
The dissent also says our decision "would have sweeping consequences for police officers.” Dissenting Op. at 1148. But this parade of horribles is baseless. The rule governing interrogations is the same after this case as it was before — it comes straight from Miranda: If a suspect unambiguously states he wants to remain silent, the officers must stop interrogating. Full stop.

. The dissent argues that Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), cannot serve as "clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254 (d)(1), because Smith rested on Miranda’s invocation of the right to counsel, not on Miranda’s invocation of the right to silence. Dissenting Op. at 1145-47. See Smith, 469 U.S. at 98-99, 105 S.Ct. 490 (discussing "the request for counsel”). The dissent contends that only recently, in Thompkins, did the Supreme Court declare the right to silence should be treated the same as the right to counsel. According to the dissent, since Thompkim postdates the California decisions in this case, it cannot serve as the "clearly established Federal law” required by AEDPA. Dissenting Op. at 1144.
With respect, we think the dissent is wrong. The dissenting opinion begins by quoting Thompkins. Dissenting Op. at 1142; see also id. at 1144. The dissent insists that we apply Thompkins to ensure that Jones invoked his right to remain silent "unambiguously,” but the dissent doesn’t want us to consider the Supreme Court's earlier cases describing what constitutes an ambiguous or unambiguous invocation. The dissent can't have it both ways. Either we apply Thompkins — and with it prior cases such as Davis, Smith, Solem, Edwards, and Miranda on which it builds — or we must ignore it. What we cannot do is say we are going to apply Thompkins and then ignore the standard Thompkim tells us to apply (the standards created in its right to counsel cases). If we ignore cases such as Davis and Smith, what standards for ambiguity are we to apply? Some new standard? That is exactly what Thompkins told us the Court would not do: "there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel at issue in Davis." Thompkins, 560 U.S. at 381, 130 S.Ct. 2250.