Filed 1/30/17

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B270653 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA082907) |
| v. | |
| ARMANDO BICHARA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge.  Affirmed in part, reversed in part, and remanded.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.

_____

This case concerns the impact of defendant Armando Bichara's recorded confession to murder on his convictions for murder and kidnapping. Defendant initially waived his right to remain silent under *Miranda*,[1] but invoked the right prior to confessing to the murder, unambiguously stating to the interrogating officers, "I refuse to talk to you guys." Defense counsel forfeited defendant's challenge to admission of the confession on this ground by failing to specifically and timely object at trial. We hold that counsel's inaction resulted in a prejudicial denial of effective assistance of counsel as to the murder conviction, as the prosecutor relied upon the confession heavily in her arguments to the jury. Defendant, however, was not prejudiced with respect to the kidnapping conviction. Evidence of that offense consisted of the victim's testimony, surveillance video capturing the crime, and corroborating testimony from two independent witnesses. Defendant did not mention the kidnapping in his confession, nor did the prosecutor rely on it when arguing the kidnapping charge. We therefore reverse the murder conviction, affirm the kidnapping conviction, and remand to the trial court to permit the People the option of retrial on the murder charge.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

# PROCEDURAL HISTORY

Defendant was convicted by jury in count 1 of the first degree murder of Maria Ontiveros (Pen. Code, § 187),[2] and in count 3 of kidnapping Guadalupe Montellano (§ 207, subd. (a)). Defendant was found not guilty in count 2 of dissuading a witness. (§ 136.1, subd. (b)(1).)

The trial court sentenced defendant to an indeterminate prison term of 100 years to life, plus a determinate term of 6 years, calculated as follows: 25 years to life for the murder conviction, which was tripled pursuant to the three strikes law (§ 1170.12, subd. (c)(2)(A)(i)); 25 years to life for the kidnapping conviction pursuant to the three strikes law (§ 1170.12, subd. (c)(2)(A)(ii)); a 5-year term for one of the prior convictions (§ 667, subd. (a)(1));[3] and an additional 1-year term based on the jury's finding defendant personally used a dangerous and deadly weapon, the knife, in murdering Ontiveros (§ 12022, subd. (b)(1)).

---

[2] Statutory references are to the Penal Code unless otherwise stated.

[3] Although defendant suffered two prior robbery convictions for purposes of the three strikes law, the convictions were not brought and tried separately, and therefore counted as only one prior conviction under section 667, subdivision (a).

# FACTS AND TRIAL PROCEEDINGS

## A. The Charged Offenses

Defendant and Montellano were asleep in her car on the afternoon of January 28, 2015, when Montellano's longtime friend Ontiveros called Montellano and asked for a ride. Montellano and defendant were homeless and living in her car at the time. Montellano drove to pick up Ontiveros, who sat in the back seat of Montellano's car. Defendant was in the front passenger seat.

Defendant and Montellano had been using drugs—methamphetamine and PCP—that day.[4] After Montellano picked up Ontiveros, defendant and Ontiveros smoked methamphetamine. Montellano was driving on the highway when defendant asked her to pull into a gas station so he could use the restroom. Montellano later joined defendant in the gas station restroom where she found him "already, like, kind of . . . trippin'" and exhibiting signs of "paranoia." She asked defendant to "pack [her] a bowl" of methamphetamine, but defendant "never did because he was already, like paranoid." According to Montellano, defendant would hallucinate when he took drugs and was "tripping." He had been acting in a similar manner for days, insisting Montellano was holding his family hostage in Las Vegas during times he was under the influence.

---

[4] Montellano said she and defendant used drugs every day during the eight months they had been seeing each other. Montellano used PCP and methamphetamine, and drank alcohol. Defendant used heroin and methamphetamine.

Defendant and Montellano returned to the car. Montellano resumed driving. Defendant was in the front passenger seat, and Ontiveros remained in back, texting on her phone. As Montellano was driving, she noticed defendant looking back and forth "a couple of times" between her and Ontiveros and thought to herself, "there he goes again tripping." Montellano felt that defendant was giving off an "ugly vibe" as though he might "snap or something." Defendant had displayed the same look several days before when he struck her in the face, knocking out her front teeth.

Montellano noticed defendant had a long kitchen knife in his lap. She asked him why he was "flossing that shit," meaning why did "he have [the knife] out." Defendant did not answer. Shortly thereafter, Montellano heard Ontiveros make a loud noise that sounded like "Ah." Montellano looked in the rear view mirror and saw Ontiveros turning purple, apparently unable to breathe. She also saw defendant "going back to his seat" from Ontiveros's direction, with the knife in his hand. Montellano felt something wet on her hands and in her hair, and realized it was blood. Ontiveros's last words were, "Why me? I never did anything to you."

Montellano said to defendant, "What the fuck is wrong with you, fool? That was my friend." Defendant responded that Ontiveros was "one of them." He told Montellano she was "next," which Montellano took to mean he was "going to come after me." Defendant took Montellano's hand to try to calm her down and said he loved her, but he also said she was holding his family hostage in Las Vegas. Montellano told defendant if he loved her, he should give her the knife. Defendant repeated he loved her.

5

Montellano took the knife from him, wrapped it in a bandana or rag, and placed it under her seat.

Montellano pulled into an alleyway between a 7-Eleven and a car wash in Pacoima, exited the car, and ran to a bus stop while crying, intending to ask someone for help. Defendant followed, continuing to insist Ontiveros was "one of them" and trying to kiss Montellano on the cheek. Eventually, defendant began "pulling [her], telling [her] to stop," and he threatened to harm her son, at which point she returned to the car with defendant. As Montellano got into the front passenger seat, she saw defendant pull Ontiveros from the back seat and leave her body on the ground.

A video camera in the area captured footage, but no audio, of portions of what took place after Montellano parked her white car in the alley. As narrated by Montellano while testifying,[5] the video depicts her driving her car into the alley, with defendant in the passenger seat. Montellano explained that the video shows her getting out of the car while defendant was talking to her. Montellano is seen exiting from the driver's side door and reaching down for her cell phone, as defendant leaves the car through the passenger door. As defendant walks around the front of the car, the video shows Montellano walking to the rear of the vehicle, away from defendant, heading in the direction of a bus stop behind the car and on the street. Montellano is seen walking quickly toward the adjacent street, still moving away from defendant, as defendant reverses course and walks back past the passenger side of car, now heading in the same direction Montellano is moving. Montellano testified that defendant was

[5] We have independently reviewed the video recording.

6

telling her "to come here," but she was confused and did not know what to do. She did not want to get back in the car "[b]ecause my friend was in the back seat, dead."

Defendant and Montellano moved out of view of the camera for approximately one minute, while they were at the area of the bus stop. Montellano testified that during this time period defendant was trying to calm her down by telling her he loved her and trying to kiss her on the cheek. A man was standing by them watching while they were at the bus stop. They are next depicted on the video adjacent to Montellano's vehicle, engaged in a physical struggle lasting approximately ten seconds. Montellano testified that defendant was pulling her, but she did not want to go back to the car. Defendant continued to insist that she leave with him. The video depicts Montellano pulling away from defendant as he grabs onto her. Montellano escapes defendant's grasp and moves quickly back toward the street, with defendant following her.

Defendant and Montellano again move toward the bus stop by the street, where physical movement can be seen, although it is not clear what is taking place. Montellano testified that defendant continued to tell her to leave with him, but she refused. Defendant tried to calm her down by kissing her on the cheek and holding her hands. Defendant spoke in a regular tone of voice, calling her "babe."

Over a minute later defendant and Montellano reappear in the video. They walk toward the car together, side by side, with their bodies in contact. Montellano testified that defendant was holding her left arm at this point, a description not inconsistent with the video. Montellano testified that she entered the passenger side of the vehicle, as shown in the video, while

7

defendant walked to the driver side and waited for her to get in the car.  Although the view is partially blocked by a pillar, defendant is seen on the video removing something from the car.  Montellano explained that defendant "pulled my friend out" and "drove away."  As the car drives off, a portion of what appears to be a body is on the ground, next to where the driver side of the car had been located.

Montellano's description of what took place near the bus stop was corroborated by two witnesses—Duly Baro and Manuel Diaz.  Baro was at the bus stop adjacent to where Montellano had parked.  She saw a bald Hispanic man arguing with a hysterical Hispanic woman near the 7-Eleven.  Baro feared the man would put his hands on the woman.  A white Nissan was parked in the area.  She told the police that the man called the woman "babe."  Diaz was also by the bus stop.  He saw a man and a woman walking in his direction.  The woman appeared to be "trying to get away."  The man spoke in a soft voice to the woman.  She tried to make a phone call, but was prevented from doing so by the man.  The woman said, "No.  No."  The couple returned to the white car and left.  Diaz saw a woman on the ground.

After dumping Ontiveros's body, defendant drove to a gas station and got out of the car.  Montellano called her mother but had no voice and was "crying and crying."  Montellano's sister got on the phone, and Montellano told her that her "friend had got stabbed in the back seat of my car."  She did not say who committed the stabbing.

Montellano and defendant walked away from the car at the gas station.  Defendant used heroin while Montellano drank rum and cried.  She then ran from defendant and hid.  She called her teenage daughter and told her she loved her.  Montellano noticed

8

her car was gone.  She called defendant and asked him to pick her up.[6]  After they had been driving awhile, defendant stopped at a drugstore and told Montellano to check the trunk for a body.  She told him he was "tripping" and nobody was in the trunk but got out of the vehicle to look, at which point defendant drove away and left her.  Montellano hitchhiked back to Los Angeles where she told two friends what had happened and confirmed her son was safe.  She went to the police the next day.

An autopsy revealed that Ontiveros died from a stab wound to the chest, nearly six inches deep.  The wound was consistent with the kitchen knife recovered from under the driver's seat in Montellano's car.  The knife was not wrapped in a bandana or other fabric when recovered from the vehicle.  The medical examiner estimated Ontiveros died 30 to 90 seconds after being stabbed.  Defendant's fingerprints and DNA were on the knife, but no blood was found on it.  There was no way to determine when defendant left his fingerprints or DNA on the knife.  DNA belonging to an unidentifiable person other than defendant was also found on the knife.[7]

---

[6] Montellano testified she called defendant at that point in time because she "thought he was going to go and get my son."

[7] The amount of DNA recovered from the knife was approximately 15 percent of the police department's ideal target sample.  The criminalist who testified for the prosecution opined the sample taken was sufficient to "produce[ ] a usable profile" and estimated that the profile matched to defendant was statistically distinct to a measurement of one in 300 million unrelated people. The defense expert testified that the small DNA sample size, combined with the presence of more than one person's DNA, raised a probability of interpretative error that

## B. Defendant's Post-Arrest Statements and Their Introduction into Evidence

### 1. *The interrogation*

On January 29, 2015, at the direction of law enforcement, Montellano texted defendant and told him to meet her at a Little Caesars pizza shop close to her family's home. When he arrived, defendant was arrested by waiting police.

Detectives Mario Santana and Daniel Robinson interviewed defendant at around 3:00 p.m. on January 30. Detective Santana read defendant his *Miranda* rights, which defendant said he understood. Detective Santana told defendant they had video of him pulling a girl who had been stabbed to death out of a car in Pacoima. Defendant denied doing any such thing and said he was not there. About nine minutes into the conversation, defendant told Detective Santana he felt "kind of like I'm detoxing. You know? And I can't really talk. I just need to -- I just want to lay down for a little bit. You know?" Defendant added, "Maybe later on, we could talk about it?" Detective Santana told defendant they could "come back later" but defendant did not appear to be high. After defendant continued to state he wanted to "lay down," Detective Santana stopped the interview, telling defendant "[m]aybe we'll come back tomorrow or the next day."

Detectives Santana and Robinson returned to interview defendant the following day, at approximately 6:15 p.m.

---

rendered the conclusion defendant's DNA was on the knife unreliable.

Defendant told the detectives he felt worse than the day before. Detective Santana believed defendant did not look ill and did not appear to be under the influence or going through withdrawal. As he later said during his trial testimony, Detective Santana believed defendant "just -- he didn't want to be interviewed. That was the fact, that he didn't want to be interviewed."

Detective Santana asked defendant if he remembered they had read him his *Miranda* rights the day before. Defendant said he remembered. The detectives told defendant they had given him a day to rest, that jail personnel indicated he was fine in terms of eating, sleeping, and healthwise, and they had returned to give him an opportunity to tell his side of the story. Detective Santana told defendant "we had the incident on video. You were in the car, you got out of the car, you pulled somebody out of the car, then you got in the driver seat, and then you drove away."

As he had done the day before, defendant insisted he had not done what the detectives were accusing him of ("I didn't do that," and, "I didn't stab her"). Defendant suggested the detectives should instead talk to the person who lured him to the location of his arrest ("Ask her," i.e., Montellano). When asked if he had anything to say in his defense, defendant responded, "Yeah. That, man, you know, I'm just really sorry, you know, for what happened." Defendant told the detectives he "[didn't] feel comfortable talking about it" and that he was "just not in the right position right now. I'm coming down. Like, my nerves are all messed up. You guys are hitting me with these questions and everything." The detectives told defendant his feelings were normal under the circumstances but if he did not tell his side of the story, someone else would. Detective Robinson then asked

11

defendant how he ended up pulling a dead girl from a car. Defendant said he "[didn't] even know what to say."

At this point, approximately 10 minutes into the interview, the following exchange took place:

"[Defendant]: Can I just go lay down?

"Detective Robinson: Well --

"[Defendant]: I just want to go lay down.

"Detective Santana: No. No. I -- I think we kind of need to talk about this. Okay.

"[Defendant]: I don't really want to talk about it right now. I want to just lay down.

"Detective Santana: Okay.

"[Defendant]: (Inaudible)

"Detective Santana: Well, here's the thing is that you did that yesterday. Okay. We -- we -- we --

"[Defendant]: But I really do. I'm still detoxing. I'm not lying to you.

"Detective Santana: I'm not saying you're lying.

"[Defendant]: I did it for a long time. You know?

"Detective Santana: Okay. Okay. But look.

"[Defendant]: No. I'm cool. I don't want to talk about this. I want to go lay down.

"Detective Santana: All right. You know what? Let me explain something, what's gonna happen. Okay, what's gonna happen is that you're gonna go to court on Monday. Okay. You're gonna get a lawyer. And the lawyer is gonna want to somehow -- and you're gonna talk to your lawyer. And he's gonna say, 'Hey.' You know, 'What happened?' And you're gonna have to trust somebody to tell the truth.

"Okay.  You need somebody to tell your side of the story.  And you're gonna go ahead and tell a lawyer, 'This is what happened,' and this and that, and you're gonna tell them how you're feeling and what the deal is.  And he's gonna say, 'Okay.  Well' --

"[Defendant]:  What's today?  Sunday?

"Detective Santana:  Today's Saturday.

"[Defendant]:  Saturday?

"Detective Santana:  We're not coming back tomorrow.

"Detective Robinson:  No.  This is it.  We're done.  We don't want to play any games.  We just want to get your side of the story.  We've given you the opportunity.  This ceases now.

"You've had over 24 hours to chill out and relax.  We left.  We let you [get] some food.  Let you get some sleep.  We've been checking on you to make sure you're good all day long, man.  All day long.  [¶] . . . [¶] . . . [¶] . . . [¶]

"[Defendant]:  I just want to go lay down real quick.  I feel dizzy right now.  I feel all messed up.

"Detective Santana:  Okay.  You know what?  I'm dizzy, too.  All right.  And I don't feel good.  All right.  But I'm here because you asked me to come back.  All right.  Yesterday, you asked us to come back today.  And you know what?

"[Defendant]:  I just don't feel good, man.  I want to go lay down.[8]

"Detective Santana:  Sit down.

"[Defendant]:  (Inaudible)

"Detective Robinson:  Sit down.

---

[8] Detective Santana testified defendant quickly stood up at this point.

"[Defendant]:  I want to go lay down.

"Detective Santana:  You know what?  You need to sit down.

"[Defendant]:  I want to go lay down.  I'm trying to tell you guys I feel dizzy, man.  I have cancer.  I have cancer, sir.

"Detective Santana:  Sit down.  Hey, look.

"[Defendant]:  Fuck, man.

"Detective Santana:  Armando, you're going through a lot in life.  Okay.

"[Defendant]:  Can I just go lay down, sir?  Please?  Please? Please?  I have cancer, man.  I feel bad.  I just want to relax.

"Detective Santana:  You feel bad?  What about this person that is dead?

"[Defendant]:  Damn, man.  You guys -- seriously?

"Detective Santana:  Seriously.

"[Defendant]:  *Can I go lay down, sir?  Please?  I refuse to talk to you guys.  There.  That's my side of the story.  Can I just go lay down, sir?  Please?*

"Detective Santana:  Look it, I know you killed her.

"[Defendant]:  There.  Now can I go lay down, sir?  Please?

"[Detective Santana]:  And you -- you just cold-bloodedly kill her?

"[Defendant]:  I didn't cold-bloodedly kill nobody, man.  I'm trying to just-- just relax right now.  You keep bugging me with these questions.  You know?

"Detective Santana:  Yeah.  Yeah.  These questions --

"[Defendant]:  Can I go fucking lay down, please?[9]

---

[9] A loud noise can be heard on the audio recording at this point.  Detective Santana testified defendant slammed both his

"Detective Santana:  You want to get (Inaudible)

"[Defendant]:  Well, whatever, then, man.  I just want to go lay down.

"Detective Santana:  All right.

"[Defendant]:  I just want to lay down.  That's it.

"Detective Santana:  Huh?

"[Defendant]:  I just want to lay down, sir.  That's all I want to do."  (Italics added.)

After this colloquy, the detectives resumed telling defendant they were giving him the opportunity to explain what happened.  About three and a half minutes later, defendant said he "thought my family was being kidnapped."  He spoke of people following him and his girlfriend, and feeling as though his family and his girlfriend and her family were all in danger.  Defendant said people had been following them on the night of Ontiveros's death and indicated that Ontiveros "had [both him and Montellano] in the car" and "was telling us to go to a certain place," which "panicked" defendant.  He said he looked at Montellano, saw "tears in her eyes" and "felt like she was in danger."  "So that's when I did that to protect her," defendant said.  The detectives confirmed he was sitting in the passenger seat, Montellano was driving, and Ontiveros was in the backseat.  Defendant then told the detectives he wanted to talk about it

---

hands on the table and then "immediately stood up and was very aggressive," in a stance to fight with his hands "clenched."  He was facing the detectives "and then he turned and he started facing the doorway to exit the room."  At that point, Detective Santana stood too because he "thought we were going to get in an altercation, or he was going to try to exit the room, which he can't do, because when we take him into that room to be interviewed, there's no one on the floor for him to take him back to his cell."

15

later and resumed asking to lie down.  After about another minute or two, the detectives agreed to end the interview.

### 2. *The introduction of the statements into evidence*

During a pretrial hearing, the prosecutor represented that she did not intend to admit defendant's statements unless he chose to testify.  Close to the end of her case-in-chief, the prosecutor stated she had changed her mind.  She provided unredacted copies of the transcript and audio recording to the court for review, stating that defense counsel already had the material, and she was uncertain whether there would be an objection to its admission.  Defense counsel responded, "Of course there will be an objection."  Counsel stated that he objected "[t]o all of it, any of it, the left side, right side, both sides.  *Miranda*, hearsay" and prejudice.

The trial court inquired whether defense counsel was familiar with the recordings.  Counsel said he "read the transcript, et cetera," but he did not have his copy with him.  The prosecutor said she had emailed the transcript to defense counsel, and offered to let him use an extra copy in her possession.  Defense counsel replied, "I do have them, but I didn't bring them to court right now."  Counsel explained that he "thought we were going to handle it tomorrow morning.  That's why I didn't bring it with me."  The court asked counsel which portions of the transcript were at issue:

"The Court: . . .  I imagine that, if anything, it is going to be admitted, it would be from *Miranda* on?  [¶]  Thoughts, [Defense counsel]?

"[Defense counsel]:  What page now?

"The Court:  Well, *Miranda* was given, I think I said page 15, line 15, by Detective Santana.  [¶] . . .  Tentatively, I would say in the first [transcript], post-*Miranda* everything comes in. But I don't think there's any reason for the pre-things to come in."

The parties then addressed the transcript of defendant's initial interview.  The court expressed concern about references to defendant's drug use and gang tattoo and moniker, which the prosecutor agreed could be redacted.  The court stated that, other than the "gang stuff" everything in the first interview "seem[ed] pretty palpable."  The prosecutor responded that the references defendant made to his cancer should be redacted as irrelevant. The court replied that the statements were relevant to defendant's state of mind, and defense counsel agreed, asserting that he thought "all the things that go to his state of mind at that time should come in."  The court admitted the cancer references "under the doctrine of completion."

The parties then discussed proposed redactions of the transcript of the second police interview.  The court suggested redacting a portion of the statement discussing gangs.  The prosecutor agreed.  Defense counsel expressed concern about redacting the gang discussion, stating, "There might be something about that that is useful.  I wouldn't want to tilt my hat to show my closing arguments."  The court concluded that the discussion should be redacted because Montellano had already testified and had been admonished not to mention anything gang-related.  Defense counsel relented.  The court then ordered redacted two more passages regarding gang affiliation and defendant's parole status, and all discussion that occurred prior

17

to the *Miranda* warning.  The prosecutor presented defense counsel with the redacted transcripts for review the next day.

The following day, defense counsel inquired as to whether certain portions of the transcript that occurred before police gave defendant the *Miranda* warning could be admitted:

"The Court:  Here's the problem:  it either comes in, or it doesn't come in. . . .  So I'm not going to let you cross[-examine] on things that came in before [the *Miranda* warning] because they have already been excluded by your motion yesterday, which I granted.

"[Defense counsel]:  Well, we excluded particular types of statements regarding gangs, and stuff like this.  It wasn't necessarily that I moved to exclude what came before that [*Miranda*] statement, per se.

"The Court:  What is it you want in particular from that pre-*Miranda* portion?

"[Defense counsel]:  There's no particular statement, per se.  It's just there's a lot of -- my client expressing his not feeling well.

"The Court:  He does that throughout after the *Miranda* is given as well.  I think at this point it would just be cumulative.

"[Defense counsel]:  What if I establish the fact that it was conversation, not going into any of the content?

"The Court:  What is the relevance of that?

"[Defense counsel]:  Because there was conversation, it was heated, and at some points maybe a little intimidating, maybe not.  But there's a dynamic that is not present in the --

"The Court:  That would be more of a 402 ruling for me to determine whether the *Miranda* was given, the waiver was given by your client without coercion.  That's an issue for me, not the jury.

18

"I don't think -- yesterday I asked if you wanted everything pre-*Miranda* to be excluded. You indicated you did. So now you want to talk about well, before *Miranda*, warnings were given. That somehow makes it seem like there was something wrong being done. That's my call, not their call.

"So *Miranda* issues are a question of law. It's a foundational issue. I have seen nothing -- I haven't heard the audio, but I wasn't asked to hear the audio before. So that's a ruling for me, not the jury."

The prosecutor represented that she had listened to the audio recording and that "it seemed very conversational." She stated that if the pre-*Miranda* transcript was admitted she should be allowed "to ask about statements that were pre-*Miranda*, and the audio should come in its entirety, and if defendant mentions it while he is on the stand, I'm going into it, all of it."

Defense counsel did not respond.

The court concluded: "Fair enough. Either it comes in or it doesn't. You asked yesterday it didn't. I ruled in your favor. [The prosecutor] redacted the CD and the transcripts in accordance with that, and I see no reason you should be able to go in to anything pre-*Miranda*. [¶] So that's the ruling."

On the same day, following the first portion of her examination of Detective Santana, the prosecutor moved to have the transcripts and audio recordings of defendant's interviews with police admitted into evidence. The court asked if there were any objections and defense counsel responded there were not. He clarified, "I should say there's [*sic*] no objections. *Whatever objections I've made, I'm now withdrawing*." (Emphasis added.) During Detective Santana's testimony, the prosecutor played the

19

redacted audio recording of defendant's post-arrest interviews, including the incriminating admissions defendant made after defendant told the detectives he refused to talk to them.

## C. The Parties' Closing Arguments to the Jury

### 1. The prosecutor's argument

The prosecutor argued defendant was guilty of first degree murder. She relied principally on Montellano's testimony, but also highlighted defendant's post-arrest admissions (including his statement that he "did that" to protect Montellano) and argued his statements were "very similar to what [Montellano] says he said to her." On the kidnapping charge, the prosecutor again relied on Montellano's testimony, but also methodically went through the surveillance video footage depicting defendant pulling Montellano back to her car, corroborated by the testimony of the two bystander witnesses near the bus stop. The prosecutor's argument did not suggest defendant had confessed to the kidnapping. Her argument on the kidnapping charge made no reference to defendant's statements during interrogation.

### 2. Defense counsel's argument

Defense counsel attacked Montellano's credibility in his argument to the jury. He emphasized Montellano admitted using PCP on the day in question, she had prior felony convictions (including a conviction for robbery), and she testified at trial in a manner inconsistent with her preliminary hearing testimony. By

20

calling into question Montellano's credibility, the defense sought to mount a two-part challenge to the evidence.

First, the defense argued there was insufficient evidence for the jury to conclude defendant was even present in the car with Montellano or that he was the man depicted in the video surveillance footage. Instead, the defense suggested the other man involved could have been her ex-boyfriend going by the name of "Trigger" who she had mentioned in a letter written to defendant.[10]

Second, assuming the jury believed defendant was the man in the car with Montellano, the defense argued there was still insufficient evidence to prove defendant was the one who stabbed Ontiveros. Defense counsel argued: "[A] person has just been stabbed in her car, and she's there. She's -- she has a motive to lie. You know she also has a history of violence. Is it possible that she had an altercation with her friend? Is it possible that none of the imagery in your minds from the description rendered . . . largely through the district attorney's own voice -- is it possible that that's just not how it happened? It's essentially possible anything could have happened in that car and Ms. Montellano is not a reliable enough witness to hang a conviction on. [¶] She has a motive to lie. She has her own criminal

---

[10] The record is devoid of substantive evidence of any involvement of the person identified as "Trigger" in the charged offenses. Defendant's statements pre-invocation of his right to remain silent show his own presence at the scene, as he directed the detectives to ask the other person who was there, meaning Montellano, what had happened.

21

exposure in that situation.  And she has time to fabricate her story before speaking to the police."

### 3.  *The prosecutor's rebuttal argument*

The prosecutor relied upon defendant's post-arrest statement to contradict the suggestion defendant may not have been the person to stab Ontiveros.  The prosecutor replayed the audio recording of the interrogation and argued it demonstrated defendant "self-corroborat[ed]" Montellano and required the jurors to "disbelieve your own ears when you[ ] listen to that audio" if they were to accept the defense theory and conclude there was a reasonable doubt as to whether defendant was the person who killed Ontiveros.  No mention was made of defendant making an admission or confession to the kidnapping.

## DISCUSSION

Defendant contends in his opening brief that the trial court committed reversible error by (1) admitting into evidence his inculpatory statements to police detectives in violation of *Miranda*; (2) instructing the jury that defendant's voluntary intoxication could be considered only on the question of whether he harbored an intent to kill, and not as to whether he acted with premeditation and deliberation as required to support a first degree murder conviction; and (3) the abstract of judgment incorrectly states defendant must pay $457 in attorney fees pursuant to section 987.8.

The Attorney General responded to the first contention by arguing defendant forfeited the *Miranda* contention by failing to

make a specific objection in the trial court. She also argued there was no *Miranda* violation, and that any error was harmless beyond a reasonable doubt. In his reply brief, defendant argued the *Miranda* invocation issue was not forfeited, but if so, trial counsel was constitutionally ineffective in failing to make an express objection that defendant invoked his right to remain silent prior to confessing to the murder. Because the Attorney General did not have an opportunity to address the claim of ineffective assistance of trial counsel, we provided her an opportunity to brief the issue by letter.

As explained below, defendant's contention that his confession followed an invocation of his *Miranda* right to remain silent is forfeited due to the absence of a timely and specific objection, as well as defense counsel's subsequent withdrawal of all objections to the prosecution evidence. Defendant's secondary position—that trial counsel was ineffective in failing to make an objection to preserve the *Miranda* invocation issue for appeal—is meritorious. Defendant has established prejudice and reversal is required of the conviction for first degree murder. Defendant has not, however, established prejudice as to his conviction of kidnapping in count 3, which we affirm.

Because we reverse the murder conviction, defendant's claim of instructional error on the murder charge is moot and need not be discussed. The written order that defendant pay $457 in attorney fees is also reversed, because as argued by defendant and conceded by the Attorney General, that order was not part of the oral pronouncement of judgment. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

## A. The Right to Remain Silent under *Miranda*

To protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* requires that, before custodial interrogation, law enforcement agencies must advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed prior to any questioning if requested. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215.) Interrogation must cease if, at any point, the suspect unambiguously invokes the right to remain silent.[11] (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381–382 (*Berghuis*); *People v. Lessie* (2010) 47 Cal.4th 1152, 1162; *People v. Stitely* (2005) 35 Cal.4th 514, 535.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339 (*Jackson*).)

---

[11] Law enforcement officers are not required to ask clarifying questions or to cease questioning altogether in response to a suspect's ambiguous or equivocal statement regarding the desire to remain silent. (*People v. Martinez* (2010) 47 Cal.4th 911, 947–948; accord, *Berghuis*, *supra*, 560 U.S. 370, 381; *People v. Bacon* (2010) 50 Cal.4th 1082, 1107–1108, fn. 5.)

## B. Forfeiture

Citing *People v. Rundle* (2008) 43 Cal.4th 76 (*Rundle*)[12] the Attorney General argues that defense counsel's generic initial reference to *Miranda* in his objection was not sufficiently specific so as to preserve defendant's claim that he unambiguously invoked his right to remain silent. The defendant in *Rundle* argued on appeal that "he invoked his right to remain silent . . . when he told [officers] he wanted to stop the interview because he had a headache and wished to return to his cell." (*Id.* at p. 115.) The *Rundle* court held that the invocation of rights issue was forfeited, because Rundle "never raised this claim in the trial court. He filed only a generic written motion requesting the suppression of all statements made to the authorities, without any discussion of which particular grounds for suppression existed; indeed, his attorney conceded after the first suppression hearing that there was no basis to challenge the admission of the statements made by defendant . . . on grounds of involuntariness, and never mentioned an invocation of the right to silence. No further testimony or argument regarding an invocation of the right to remain silent during the interviews . . . was offered at the second hearing, and the trial court made no finding regarding whether defendant invoked his right to silence at the conclusion of the first interview." (*Ibid.*)

Citing Evidence Code section 353, subdivision (a), and its own jurisprudence, the *Rundle* court held that a judgment may be reversed because of erroneous admission of evidence only if

---

[12] *Rundle* was disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.

there is a timely and specific objection. (*Rundle, supra*, 43 Cal.4th at p. 116.) A "'placeholder'" objection, on general or incorrect grounds, is not sufficient to preserve a specific issue. (*Ibid.*) The "entirely generic motion to exclude all of [Rundle's] statements to law enforcement officers, coupled with the absence of specific argument that defendant had invoked his right to silence at the end of the first interview, failed to preserve this claim for appeal. [Citation.]" (*Ibid.,* fn. omitted.)

Here, when advised the prosecutor had changed strategy and would seek to introduce defendant's recorded statements in her case-in-chief, defense counsel stated that he objected "to all of it, any of it, the left side, right side, both sides. *Miranda*, hearsay" and prejudice, while never mentioning a claim that defendant had invoked his right to remain silent. As to the generic *Miranda* objection, the trial court reasonably focused on whether defendant had been provided his *Miranda* rights, and after determining he had, tentatively noted that "post-*Miranda* everything comes in." Over the course of the two days, as the parties discussed redactions to the statement and the scope of cross-examination of the detective, defense counsel never once mentioned that defendant invoked his right to remain silent. And in the end, as the prosecutor moved to introduce exhibits, including the audio recording of defendant's interview, defense counsel responded, "I should say there's no objections. *Whatever objections I've made, I'm now withdrawing*." (Emphasis added.)

Although the prosecutor changed strategy late in the trial when she decided to offer defendant's confession to murder during her case-in-chief, this is not a case in which defense counsel was taken by surprise and thereby relieved of the obligation to make a specific and timely objection. (See *In re*

26

*Khonsavanh S.* (1998) 67 Cal.App.4th 532, 537 [exercising discretion to eschew forfeiture where defense counsel had little time to react and was "utterly surprised" by court's order]; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7 [citing *In re Khonsavanh S.* with approval].)  When the prosecutor announced her new decision, the court immediately asked defense counsel if he was familiar with the recordings.  Counsel had "read the transcript, et cetera," but he did not have his copy with him.  The prosecutor had emailed the transcript to defense counsel and offered him an extra copy in her possession.  Defense counsel stated, "I do have them, but I didn't bring them to court right now," because "I thought we were going to handle it tomorrow morning.  That's why I didn't bring it with me."  Defense counsel was aware of the issue, although perhaps mistaken about the timing, but he had ample time to formulate an invocation of rights objection during the ensuing discussion, which spilled over to the following day.  The failure to make a timely and specific objection cannot be excused on the basis of surprise.

Based on the holding in *Rundle*, we conclude that defendant failed to make a specific and timely objection to introduction of his recorded statement on the ground that he had invoked his right to remain silent.  Whatever objections had been made were expressly withdrawn.  The issue of whether defendant invoked his right to remain silent was never tendered to the trial court and, as in *Rundle*, "the trial court made no finding regarding whether defendant invoked his right to silence." (*Rundle, supra*, 43 Cal.4th at p. 115.)  The issue is forfeited.

## C. Effective Assistance of Trial Counsel

Defendant contends that counsel's failure to object based on his clear invocation of the right to remain silent—"I refuse to talk to you guys.  There.  That's my side of the story"—resulted in a denial of the effective assistance of counsel.  We agree that effective counsel would have made an objection and that there is no imaginable tactical reason for failing to object, because there is nothing favorable to defendant in his statement after he invoked the right to remain silent, nor did counsel use the statement to defendant's advantage in argument.  Defendant suffered prejudice as to the murder conviction in count 1, but not as to the kidnapping conviction in count 3.

### 1. *The right to effective assistance of trial counsel*

A criminal defendant has the right to the effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*), citing *McMann v. Richardson* (1970) 397 U.S. 759, 771, fn. 14.)  "Counsel . . . can . . . deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.'" (*Strickland*, *supra*, at p. 686, citing *Cuyler v. Sullivan* (1980) 446 U.S. 335, 344.)  The purpose of effective assistance of counsel is  "to ensure a fair trial," which is judged by deciding "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  (*Strickland*, *supra*, at p. 686.)  The *Miranda* protection of a defendant's Fifth Amendment privilege against self-incrimination "safeguards 'a fundamental *trial* right.'  [Citations.]"  (Emphasis added.)

(*Withrow v. Williams* (1993) 507 U.S. 680, 691; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 ["The admission of an involuntary confession is a 'trial error,' similar in both degree and kind to the erroneous admission of other types of evidence."].)

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland, supra,* 466 U.S. at p. 687.)

Where a claim of ineffective assistance is premised on the failure to file a timely motion to suppress evidence, the defendant must show (1) a failure to provide objectively reasonable representation, (2) that the motion would have been meritorious, and (3) "that there is a reasonable probability that the verdict would have been different absent the excludable evidence." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375 [failure to file motion to suppress evidence under the Fourth Amendment].) "[T]he *Strickland* 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights.

(E.g., *People v. Ledesma* [(1987)] 43 Cal.3d [171,] 208–209, 217 [applying *Strickland's* 'reasonable probability' test for prejudice to defense counsel's alleged deficiencies, including failure to protect defendant's Fourth Amendment rights by filing suppression motion directed to telephone call intercepted by police after warrantless entry of defendant's residence]; *In re Avena* (1996) 12 Cal.4th 694, 721–722, 731 [applying *Strickland* standard to counsel's failure to object to defense counsel's waiver of defendant's right not to appear before jury in jail clothes]; see *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 437 (opn. of Johnson, J.).)" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008–1009.)

### 2. *Application of the first prong of Strickland*

To satisfy the first prong of *Strickland* in this case, defendant must establish that his attorney's performance was unreasonable "under prevailing professional norms" (*Strickland*, *supra*, 466 U.S. at p. 688) when counsel failed to pursue an objection that defendant invoked his right to remain silent when he told the detectives, "I refuse to talk to you guys. There. That's my side of the story." Determination of whether counsel's performance was inadequate under this standard requires analysis of the admissibility of the confession. We conclude the confession was inadmissible as a matter of law.

"'Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.' (*People v. Duff* (2014) 58 Cal.4th 527, 551.) We review issues concerning the suppression of such statements under federal constitutional standards.

30

(*People v. Nelson* (2012) 53 Cal.4th 367, 374.)" (*Jackson, supra*, 1 Cal.5th at p. 339; see *Berghuis*, *supra*, 560 U.S. at pp. 381–382; *People v. Tom* (2014) 59 Cal.4th 1210, 1225 (*Tom*).) We consider the full context of the interrogation and assess whether "a reasonable police officer in the circumstances would understand the statement[s]" to be an unambiguous request to stop further questioning. (*Davis v. United States* (1994) 512 U.S. 452, 459; see also *Berghuis*, *supra*, at pp. 381–382; *Tom*, *supra*, at p. 1228.)

At the beginning of the interrogation exchange defendant told the detectives he "[didn't] really want to talk about it right now." Shortly after that, defendant said, "No. I'm cool. I don't want to talk about this. I want to go lay down." These two statements do not establish that defendant unambiguously exercised his right to cut off further questioning. (See *People v. Williams* (2010) 49 Cal.4th 405, 432–433 [accused's statement, "'I don't want to talk about it,'" is not an invocation of *Miranda* rights but rather an expression of frustration that officers did not accept his repeated assertions that he was not acquainted with the victim]; *People v. Jennings* (1988) 46 Cal.3d 963, 977–978 [accused's statement, "'You're scaring the living shit out of me. I'm not going to talk,'" not an invocation of right against self-incrimination but rather an angry outburst]; compare *Berghuis*, *supra*, 560 U.S. at p. 382 [if a defendant says "he d[oes] not want to talk with the police," that "simple, unambiguous statement[s]" would invoke the ""'right to cut off questioning'""].)

After defendant twice told the detectives he did not want to answer questions about what happened to Ontiveros, defendant stood up to signify his desire to leave the interrogation room and bring an end to the questioning. The detectives did not halt the interrogation, but instead they resumed questioning after

ordering defendant to sit back down. Defendant made yet another attempt to cease answering questions using explicit terms: "I refuse to talk to you guys. There. That's my side of the story. Can I just go lay down, sir? Please?" A reasonable officer under the circumstances would have understood this statement—especially in context of defendant's prior expressions of a desire not to talk and his repeated requests to leave the interrogation room to go lie down—to be an invocation of his right to decline to answer further questions and end the interview. (See *Jackson*, *supra*, 1 Cal.5th at pp. 336, 339 ["'Man just take me to jail man. I don't wanna talk no more'" invokes the right to remain silent].)[13]

The interrogation that followed defendant's statement that he refused to talk to the officers was a violation of *Miranda*. Defendant's incriminating statements, which came only after the detectives did not honor his invocation of his right to cut off further questioning, should not have been admitted during the prosecution's case at trial. (*People v. Wash* (1993) 6 Cal.4th 215, 238 [once a request to remain silent is made, "it must be 'scrupulously honored'; the police may not attempt to circumvent the suspect's decision 'by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance]; (*People v. Sims* (1993) 5 Cal.4th 405, 440. ["Statements obtained in violation of *Miranda* are inadmissible to establish guilt"].)

---

[13] The Attorney General did not dispute in *Jackson* that the defendant had invoked his right to remain silent through the statement quoted above in the text. The issue decided on appeal was whether the defendant later "reinitiated contact with the officers." (*Jackson, supra*, 1 Cal.5th at p. 339.)

Professional norms require competent counsel to object to a confession obtained in violation of *Miranda*, unless there are tactical reasons to admit the statement, a circumstance not present in this case.  Defendant has satisfied the first prong of *Strickland*.

### 3.  Application of the second prong of Strickland

"Even if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must [also] show that they actually had an adverse effect on the defense." (*Strickland, supra*, 466 U.S. at p. 693.)  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

We discuss the issue of prejudice separately as to the murder and kidnapping convictions.

#### a.  Prejudice as to the murder conviction

While the Attorney General makes a determined argument on prejudice as to the murder, we are satisfied that defendant has carried his burden of establishing a "reasonable probability" under *Strickland* of a different result on the murder charge had his confession been excluded.  The prosecution's case was built on Montellano's testimony that defendant stabbed Ontiveros, and other evidence that points in that direction.  While Montellano's testimony certainly constitutes substantial evidence to support the conviction of murder, her credibility was in dispute at trial.

Montellano was in the car at the time Ontiveros was killed, she had prior felony convictions, there were some conflicts between her trial testimony and her prior statements, and she was a regular drug user who admitted ingesting PCP on the day Ontiveros was killed. Her demeanor at trial made communication difficult, to the point that the prosecutor felt compelled to ask her why she would turn away from the jury and "hunch over" while testifying, and why "[t]here were several times that before you answered a question, you would look over in the direction of [defendant] and start to cry."[14]

The prosecution made compelling use of defendant's post-invocation confession during closing argument to counter the defense efforts to sow reasonable doubt as to the murder. Introduction of the confession played a significant role in defendant's conviction. The prosecutor effectively argued that defendant's confession corroborated Montellano's version of the murder. As a general matter, confessions constitute compelling proof of a defendant's guilt, and improper admission of a confession in violation of *Miranda* is more likely to be prejudicial than other evidentiary errors. (See *People v. Cahill* (1993) 5 Cal.4th 478, 503 (*Cahill*) [inadmissible confessions are more likely to affect the outcome of a trial than are other categories of evidence, as confessions invariably provide persuasive evidence of a defendant's guilt and operate as an "'evidentiary bombshell which shatters the defense'"].) Defendant's post-invocation statements provided much-needed corroboration of Montellano's testimony.

---

[14] Montellano's answer to both of these questions was, "I don't know."

Under these circumstances, we conclude counsel's failure to object to defendant's confession on the ground it followed an invocation of his *Miranda* rights was "unreasonable" and the error "actually had an adverse effect on the defense." (*Strickland*, *supra*, 466 U.S. at p. 693.) The conviction of murder in count 1 must be reversed.

### b. *Lack of prejudice as to the kidnapping conviction*

The circumstances pertaining to the kidnapping conviction stand in sharp contrast to the murder charge.[15] Our first consideration is the fact that defendant's post-invocation confession to the killing of Ontiveros *makes no mention of any aspect of the kidnapping*. In other words, defendant seeks reversal of the kidnapping count, but there is no inadmissible statement relating to that offense.

Second, defendant made statements prior to his invocation of the right to remain silent, which show his consciousness of guilt and corroborate portions of Montellano's testimony as to the

---

[15] The kidnapping occurred, according to the prosecutor, when Montellano "was at the bus stop and did not want to get back in that car." In a supplemental letter brief to the court, defense counsel on appeal recognized that "the prosecutor specifically relied on the incident occurring when they exited the vehicle in the alley near the bus stop/7-Eleven," and the "prosecutor relied upon the alleged threats made by [defendant] to Montellano, as recounted in the testimony of Montellano." The letter brief also recognizes "the video does show the two people in an apparent disagreement and physically struggling with each other . . . ."

kidnapping.  Before defendant invoked his right to remain silent, detectives confronted him with the fact there is a video showing defendant pulling Ontiveros's lifeless body from the car and driving away.  Despite irrefutable evidence to the contrary, defendant denied his conduct as shown on the video and denied he was even present at the scene.  The contrary views expressed by the dissent are incorrect.  Defendant's denials demonstrate a consciousness of guilt.  (See *People v. Green* (1980) 27 Cal.3d 1, 40–41 [jury may infer consciousness of guilt where defendant's statements to the police are inconsistent with the evidence presented at trial].)  Defendant also placed himself at the scene by telling the detectives, prior to invoking the right to remain silent, that they should talk to the other person who was there.  His false denial, and his admission to being present at the scene of the kidnapping, indicate that Montellano's version of the events at the time of the kidnapping are accurate.

Third, the prosecutor's argument to the jury as to the kidnapping charge made no mention of defendant's confession to the murder.  Instead, the prosecutor relied on Montellano's testimony, which was corroborated by "a videotape of the commission of the crime" of kidnapping.  (See *People v. Neal* (2003) 31 Cal.4th 63, 86, citing *Cahill*, *supra*, 5 Cal.4th at p. 503 [a video recording of a crime could support a finding that erroneous admission of a confession is harmless beyond a reasonable doubt, a higher standard than applicable to a claim of ineffective assistance of counsel].)  The prosecutor played the video recording for the jury during argument, highlighting how it corroborated Montellano's testimony.

The most powerful reason any error was harmless as to the kidnapping is the video recording.  The recording is consistent

with Montellano's testimony that she was trying to get away from defendant, and that he physically coerced her to return to her car. She is seen exiting her car and moving quickly away from defendant, toward the street where the bus stop is located. Although not entirely clear, there is some physical interaction between Montellano and defendant before they move out of the camera's view. About one minute later they reappear in the video, slightly to the left and behind the car, engaging in a physical struggle. The recording clearly shows Montellano struggling to escape defendant's grip, as he tries to pull her to the car. Montellano manages to break away from defendant, and again moves quickly toward the street, away from the car, with defendant in pursuit. Physical contact again appears to be taking place by the street, although the recording is not clear enough to determine exactly what is taking place. When they appear again on the recording, they are side by side, with physical contact taking place, which Montellano explained was defendant grabbing her by the arm on the way back to the car. Just as Montellano testified—and contrary to defendant's false statement to the detectives prior to invoking his right to remain silent—the video shows him dumping Ontiveros's lifeless body in the alley. There is nothing on the video recording that is helpful to defendant as to the kidnapping charge.

Objectively viewed, the video demonstrates the veracity of Montellano's testimony that she had no desire to return to a car containing her deceased friend, and that she was forced to do so physically by defendant and under the influence of his threat to hurt her son. All defendant can muster to refute the video is "pointing to flaws and inconsistencies in" Montellano's

37

testimony,[16] but "the defense failed to rebut the foregoing evidence or to raise any credible defenses" to the kidnapping charge. (See *People v. Johnson* (1993) 6 Cal.4th 1, 32–33, abrogated on other grounds by *People v. Rogers* (2006) 39 Cal.4th 826, 879–880.)

We add to the compelling weight of the video recording the corroborating testimony of Baro and Diaz, wholly independent witnesses who described what occurred by the bus stop and in the alley in terms consistent with Montellano's version of events. Baro saw a hysterical woman—obviously Montellano—arguing with a bald Hispanic man—obviously defendant. The argument was sufficient that Baro feared the man would put his hands on the woman, which is exactly what is shown on the recording. Baro told the police that the man called the woman "babe," again corroborating Montellano. Diaz was more explicit. He saw a woman who appeared to be "trying to get away." Diaz also testified that the man spoke in a soft voice to the woman. She tried to make a phone call, but was prevented from doing so by the man. The woman said, "No. No."[17]

The burden is on defendant to establish prejudice under the second prong of *Strickland*. We are satisfied his confession to

---

[16] Not surprisingly, defense counsel's argument to the jury made no mention of the video recording, as there was nothing favorable to defendant in it as to the kidnapping.

[17] The dissent, for reasons unexplained, fails to acknowledge the existence of this evidence.

murder did not result in an unreliable result at trial as to the kidnapping. [18]

## DISPOSITION

Defendant's conviction of murder is reversed. The conviction of kidnapping is affirmed. The cause is remanded to the trial court to allow the prosecution the opportunity to retry the murder charge. When a new abstract of judgment is prepared, the trial court is directed to delete the reference to payment of $457 in attorney fees pursuant to Penal Code section 987.8.

KRIEGLER, Acting P.J.

I concur:

KUMAR, J.[*]

---

[18] Our dissenting colleague does not acknowledge the standard of review in the context of the claim of ineffective assistance of counsel. The subjective standard of review adopted by the dissent—"I cannot hold harmless the admission of the incriminating statements"—apparently shifts the burden on the issue of prejudice to the prosecution, in conflict with decisions of the United States and California Supreme Courts, which require the defendant to show probability of a more favorable result.

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The People v. Armando Bichara
B270653


BAKER, J., Concurring in Part and Dissenting in Part



The interrogation of defendant Armando Bichara presents a textbook violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Not only did the interviewing detectives refuse to honor defendant's unambiguous invocation of his right to cut off further questioning during the interrogation,[1] the testimony of

_____

[1] The majority opines that two statements defendant made before telling the detectives "I refuse to talk to you guys" do not qualify as unambiguous invocations of the right to remain silent. (Maj. Opn. at p. 31.) As is true in many instances where a court expresses a view on a point not necessary to its decision, the observation is inadvisable. There is binding and persuasive authority that suggests otherwise. (See, e.g., *Berghuis v. Thompkins* (2010) 560 U.S. 370, 382 [if a defendant says "he d[oes] not want to talk to the police," that "simple, unambiguous statement" would invoke the right to cut off questioning]; *People v. Villasenor* (2015) 242 Cal.App.4th 42, 65 [minor "defendant's repeated demands to be taken home, to have his parents called to pick him up, and to wait out the 48 hours," he could be held before charges filed unambiguously invoked his right to end the interrogation]; *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1420-1421 [accused unambiguously invoked her right to remain silent by saying she did not want to answer any more questions]; *Jones v. Harrington* (9th Cir. 2016) 829 F.3d 1128, 1139-1140 [Court of Appeal's determination that accused's statement, "I don't want to talk no more," was an ambiguous invocation is contrary to and an unreasonable application of *Miranda*].)

one of the detectives later at trial revealed a fundamental misunderstanding or unawareness of what *Miranda* and its progeny require.[2] I therefore concur in the judgment that the *Miranda* violation compels reversal of defendant's murder conviction.

I respectfully dissent, however, from the holding that the admission of the incriminating statements obtained in violation of *Miranda* did not prejudice the jury's finding that defendant kidnapped his girlfriend Guadalupe Montellano. I will summarize several reasons why; they involve my disagreement with the majority about the relationship between the murder and kidnapping charges, the mediocre quality of the video footage introduced at trial, and the fact that the video does not, and cannot, corroborate the key element of fear that Montellano emphasized as the reason why, according to her, she got in the car with defendant against her will.

---

[2] At trial, defense counsel cross-examined one of the two interviewing detectives, asking whether he attempted to be "the more dominant person in the room" to "maintain control of the interrogation" when defendant stood up after telling the detectives he refused to talk to them. The detective answered, "No. *What it is, the key here is that [defendant] wanted to end the interview*, and his way of ending the interview is exiting the room." (Emphasis added.) Questioned further, the detective testified: "So as far as the fact that he slammed his hands on the table and stood up, I have to establish the ground rules that—not that I'm more intimidating or dominant, but the fact that *I'm not going to tolerate ending the interview before the interview is over*. So I have to stand my ground." (Emphasis added.)

# I

It is true that defendant's statements obtained in violation of *Miranda* included no specific admission to kidnapping Montellano. But the murder and kidnapping charges that serve as the basis for defendant's convictions, at least as presented by the prosecution at trial, were so intertwined that a conviction on the kidnapping charge makes little if any sense when divorced from the murder charge.

Montellano's claim to have witnessed defendant stab Maria Ontiveros was the ostensible motive for why defendant, who was Montellano's boyfriend and living with her in her car, would have kidnapped her. At oral argument in this court, the People conceded the point, agreeing that the prosecution's theory at trial "was that the kidnapping was precipitated by the murder of Ontiveros" and that "the motive was that she would not go to the police—so that's why he kidnapped her." (Rec. of Oral Arg., November 2, 2016.) Because the *Miranda*-tainted statements played a significant role in defendant's murder conviction, and because the facts concerning the murder served as motive evidence that must have informed the jury's guilty verdict on the kidnapping charge, the conclusion we must draw is unavoidable: the incriminating statements likewise played a significant role in defendant's kidnapping conviction regardless of whether he was questioned about kidnapping Montellano when interrogated by the detectives. (*People v. Moore* (2016) 6 Cal.App.5th 73, 85 ["The prosecution need not, as we know, prove motive. Nevertheless, motive is relevant, and a strong motive provides powerful evidence"], citations omitted; see also *People v. Cahill* (1993) 5 Cal.4th 478, 503 ["[T]he improper admission of a confession is much more likely to affect the outcome of a trial than are other

3

categories of evidence, and thus is much more likely to be prejudicial . . .”].)

## II

During trial, the prosecution introduced surveillance video footage that depicted, according to Montellano, her interactions with defendant near a bus stop. Unfortunately, the video is distant (meaning the camera is far from the events of interest), jumpy, pixelated, and static (meaning there is only one camera angle, and there are long stretches where no one is visible). The majority makes a good faith effort to characterize the quality of the video in a better light, but the overall state of the video evidence, in my view, is best described by the concessions that aspects of the footage are "not entirely clear" and "not clear enough."[3] (Maj. Opn. at p. 37.) Without a clearer depiction of what transpired, the video evidence cannot be a powerful reason why the *Miranda* violation did not prejudice the jury's kidnapping verdict.

Although I do not believe the majority opinion's narration of the video is what the video shows when "[o]bjectively viewed" (Maj. Opn. at p. 37), the opinion further reasons that defendant's refusal to admit what the majority believes the video shows can

---

[3] The majority believes the video clearly shows defendant and Montellano engaging in a physical struggle and Montellano "struggling to escape defendant's grip[ ] as he tries to pull her to the car." The video does unquestionably depict some sort of brief struggle between two people. But it is not clear who started the struggle, what exactly transpired, or whether one of the participants is attempting to pull the other to the car.

4

be used as evidence of his consciousness of guilt.  I would not draw this conclusion, for both factual and legal reasons.

Factually, the video is not "irrefutable evidence" of defendant pulling the victim's dead body out of the car (Maj. Opn. at p. 36).  The video by itself is not evidence of identity at all— given the mediocre quality of the footage, it is impossible to identify who is depicted in the video solely by viewing it.  Nor do I believe the video by itself shows someone pulling a dead body from the car.  The video does depict a person opening the rear door of the car and appearing to reach inside (there is a pole partially obstructing the view), but it is the testimony at trial— not the video itself—that supplies the important details.  I accordingly believe there is no basis to conclude defendant's refusal to admit certain facts when interrogated by the detectives was tantamount to a denial of irrefutable video evidence.  In fact, the detectives never actually confronted defendant with the video footage during the interrogation.  For all defendant knew, the detectives were bluffing and there was no video.

Legally, I am concerned the "consciousness of guilt" holding in today's opinion is unsound and could be put to misuse in future cases.  I see no valid reason why a defendant's post-arrest refusal to admit details of a crime (or perhaps a refusal to confess more generally) is, without more, reason to infer the defendant is conscious of his own guilt.[4]  A person subject to questioning who

---

[4]     I have no quarrel with the proposition that a defendant who affirmatively offers a highly implausible account of events can be found to have exhibited a consciousness of guilt.  That was the scenario in the case of *People v. Green* (1980) 27 Cal.3d 1, where the defendant "recounted that at 5 p.m. on the day of the murder he received a telephone call from Karen telling him she

does so refuse undoubtedly hopes to avoid punishment, but a desire to avoid punishment does not necessarily mean the person believes himself to be guilty. In addition, the majority's rationale has a "heads I win, tails you lose" quality to it: if a defendant concedes certain accusations of an interrogating officer are correct, he has directly incriminated himself; if he denies the accusations, according to the majority, he has shown himself to be conscious of his guilt and indirectly incriminated himself—at least if the evidence pertaining to the accusatory questions is sufficiently irrefutable in the eyes of a court (or of a prosecutor requesting a consciousness of guilt jury instruction at trial). I believe this sort of reasoning expands the consciousness of guilt doctrine beyond the circumstances in which it should apply. For that reason and the factual reasons I have already described, I do not believe the video evidence and/or a consciousness of guilt inference are sufficient reasons to conclude the *Miranda* violation did not prejudice the jury's kidnapping verdict.

---

needed transportation to the Stickey Wicket bar and that he sent Dave Khan to pick her up for this purpose" even though the record was "replete with testimony by other witnesses relating different versions of the critical events told to them by [the] defendant" including "the fabrication of an alibi." (*Id.* at pp. 40-41.) It is quite a different thing to hold, however, that a mere denial of an officer's incriminating accusation during an interrogation warrants a consciousness of guilt inference. All the more so if the defendant, as here, is never actually confronted with the evidence the officer cites when making the accusation.

6

## III

I will make a final point, which focuses on Montellano's trial testimony about the charged kidnapping, specifically, the portion of her testimony that supported the element of kidnapping that requires proof she was unlawfully moved by the use of physical force or fear.  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1368 ["'Generally, to prove the crime of [simple] kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance'"].)  Montellano emphasized it was fear induced by an asserted threat from defendant that compelled her to leave with him, and the video evidence does not corroborate this aspect of her testimony.

Montellano testified as follows concerning the reason why she felt compelled to accompany defendant in the car when leaving the bus stop area:

> Q [by the prosecutor]:   As you were trying to cry out for help and pointing to the car, what was [defendant] doing?
>
> A [by Montellano]:   He was pulling me, telling me to stop.
>
> Q:   Did you end up going back to the car?
>
> A:   Yes.
>
> *Q:   Why did you end up going back to the car?*
>
> *A:   Because that's where he threatened me.*
>
> Q:   What did he say that you found threatening?  What was the threat?
>
> A:   That he was going to get my family.
>
> Q:   He said he was going to get your family?

7

A:   My son.

Q:   Specifically, your son?

A:   Yes.

Q:   Did you believe him?

A:   Yes.

Q:   Why did you believe him?

A:   Because of everything that had happened.

Q:   [¶] . . . [¶]  What had happened that made you believe he could get your son, or that he would get your son?

A:   Because of what he did to my friend.[5]

(Emphasis added.)

While Montellano said defendant pulled her and grabbed her arm at points during their interaction near the bus stop, she testified it was defendant's threat to harm her son that compelled her to return with him to the car and drive off.  This testimony served as the proof of the force or fear element of kidnapping.

The threat Montellano claimed defendant made cannot be heard on the video; the camera recorded no audio at all.  That means that on the key issue of whether Montellano was unlawfully moved by fear, her testimony—impeachable for the reasons identified by the majority *ante* at pages 33 to 34—was largely if not entirely uncorroborated.  Under the circumstances, and with the other points I have already discussed in mind, I

---

[5]   The latter part of this exchange again highlights the interrelationship between the kidnapping charge and the murder charge (see Part I, *ante*).

8

cannot hold harmless the admission of the incriminating statements the detectives obtained in violation of *Miranda*. In my view, a new trial is required on both the murder charge and the kidnapping charge.


BAKER, J.